**UNITED STATES of America,
Appellant,**

v.

**Charles Martin BUSH and John A. Bush,
Executors Under the Last Will and Testament of Martin Bush, Deceased.**

**No. 12338.**

United States Court of Appeals
Third Circuit.

Argued Jan. 23, 1958.

Decided June 11, 1958.

Morton Hollander, Washington, D. C. (George Cochran Doub, Asst. Atty. Gen., Chester A. Weidenburner, U. S. Atty.,

Newark, N. J., Myles F. Gibbons, Gen. Counsel, Louis Turner, Asst. Gen. Counsel, Ernest O. Eisenberg, Atty., Railroad Retirement Board, Chicago, Ill., on the brief), for appellant.

Charles W. Hutchinson, Jersey City, N. J., for appellees.

Gerald D. Finney, Counsel, Association of American Railroads, and Lester P. Schoene, Counsel, Railway Labor Executives' Ass'n, Washington, D. C., amici curiae and in support of appellant's position.

Before BIGGS, Chief Judge, KALODNER, Circuit Judge, and WRIGHT, District Judge.

BIGGS, Chief Judge.

This appeal is from a judgment of the district court dismissing an action by the United States to recover moneys paid to the late Martin Bush as annuities under the Railroad Retirement Act of 1937, 50 Stat. 307 as amended by 60 Stat. 722, 65 Stat. 683 and 66 Stat. 777, 45 U.S.C.A. §§ 228a–228y.

Section 2(a) of the Railroad Retirement Act, 45 U.S.C.A. § 228b(a), states as a condition of eligibility that the applicant for an annuity shall have ceased to render compensated service to any person whether a railroad or non-railroad employer.[1]

The facts in this case are clear. On April 9, 1947, the late Martin Bush, the decedent, filed his application for an annuity with the Railroad Retirement Board, and on July 1, 1947, the date Bush's annuity accrued, he was employed by and was receiving compensation from the New York, Susquehanna and Western Railroad, and the North Jersey Paper Company, a non-railroad employer. Bush worked for the railroad from eight o'clock in the morning to five o'clock in the afternoon. In the late afternoon, on evenings, and on Saturdays, Bush was employed by the Paper Company as supervisor of maintenance. Although this work was not performed under a contract of employment, the record shows a continuous course of remunerated activity.[2]

Bush did not terminate his employment with the Paper Company prior to receiving his annuity, but instead continued to work for and be compensated by the Paper Company while receiving his annuity.

After Bush's death, the Railroad Retirement Board discovered that Bush had rendered compensated service to the Paper Company from March or April 1947

---

1. The controlling provisions of Section 2 (a) are:

"(a) The following-described individuals * * * shall, subject to the conditions set forth in subsections (b), (c), and (d), be eligible for annuities after they shall have ceased to render compensated service to any person, whether or not an employer as defined in section 1 (a) (but with the right to engage in other employment to the extent not prohibited by subsection (d) ) * * *."

Sections 2(b) and (d), provide:

"(b) An annuity shall be paid only if the applicant shall have relinquished such rights as he may have to return to the service of an employer and of the person by whom he was last employed * * *.

*    *    *    *    *    *

"(d) No annuity shall be paid with respect to any month in which an individual in receipt of an annuity hereunder shall render compensated service to an employer or to the last person by whom he was employed prior to the date on which the annuity began to accrue. Individuals receiving annuities shall report to the Board immediately all such compensated service."

2. Bush's salary as supervisor of maintenance was $1.25 per hour. He was also a corporate director and vice-president of the Paper Company, but received no compensation for this. Bush received the total sum of $611.25 from the Paper Company for services rendered during the months immediately preceding July 1, 1947, as follows: $103.75 for 83 hours of service in March; $178.78 for 143 hours in April; $140 for 112 hours in May; and $188.75 for 151 hours in June. Thereafter, during the remainder of 1947 and the year 1948 Bush's paper company employment varied from 128½ hours per month to 184 hours per month, and his wages ranged from $160.62 to $230 monthly, with the exception of February 1948 when Bush worked only 40 hours and earned only $50.

through April 30, 1949.[3] Accordingly, the Board ruled that all annuity payments made to Bush prior to May 1, 1949, a total amount of $2,694.75 had been unlawfully made and should be recovered by the United States. On June 15, 1953, the United States filed suit in the court below demanding a judgment against Bush's estate for the mistaken payments.

The United States contended that Bush's employment by the Paper Company was such as to disqualify him from receiving annuities under Section 2 of the Act because Bush had not ceased "to render compensated service to any person" prior to obtaining his railroad retirement annuity. The court below found that the relationship between Bush and the Paper Company was one of "casual auxiliary employment" and that such employment was not encompassed within the terms of Section 2. Accordingly the court ruled that Bush's failure to terminate his relationship with the Paper Company prior to the receipt of his annuity worked no disqualification of his right to the annuities.[4] The appeal followed.

As the language of Section 2(a) is clear in its requirement that the applicant for an annuity must cease the performance of compensated service in which he is then engaged to any person, and since the record is clear that Bush continued to work for the Paper Company after his annuity accrued, the basic issue for our determination is whether Bush's employment by the Paper Company constituted "compensated service" within the meaning of Section 2.

■ An analysis of the record in this case indicates that in June 1947, the month preceding the accrual of Bush's benefits, Bush averaged approximately 35 hours and $44 per week with the Paper Company. The months prior to June also show substantial service. Note 2, supra. In view of the fact that Bush

worked an eight hour day with the railroad, it appears to us that his Paper Company employment represented a maximum utilization of his available time. We cannot agree that such activity can be classed as "casual auxiliary employment." The finding of the court below in this respect is clearly erroneous.

■ However, even more fundamental, is the fact that Section 2(a) creates no distinction between casual and regular employment. The exact language of the section precludes the rendition of "compensated service to any person." Thus, if an employee has more than one employer at the time of his retirement he must stop performing compensated service to all. See "Hearing Before the Committee on Interstate and Foreign Commerce," 75th Cong., 1st Sess., H.R. 6956, p. 75. See also House Report No. 1069 accompanying H.R. 7519, 75th Cong., 1st Sess., p. 4.

Of special significance is the fact that Congress made only one express exception to the provisions of Section 2. This is contained in Section 1(h), 45 U.S.C.A. § 228a(h), and under its provisions, for the purposes of Section 2, compensation earned in the service of a local lodge or division of a railway-labor-organization employer shall be disregarded with respect to any calendar month if the amount thereof is less than $3. It is quite obvious that if Section 2 were not intended to apply to casual service, the exception in Section 1(h) would have been unnecessary.

The legislative history of Section 2 is also significant. In view of the limited resources available for retirement benefits, Congress believed that if participation in such benefits was to be confined to those who had completely retired from the labor market as distinguished from those who were still employed, a more generous provision could be made for a group which was completely reliant upon re-

<hr>

3. When Bush made application for his annuities he described his compensated service for the railroad; however, in his application he denied the perform-

ance of compensated service for any other person, company or institution.

4. See 149 F.Supp. 631.

tirement benefits. Accordingly, it was suggested that the Railroad Retirement Act of 1937 contain a provision which would prevent an annuity in respect to any calendar month during which an annuitant was engaged in regular gainful employment. "Hearing Before the Committee on Interstate and Foreign Commerce", 75th Cong., 1st Sess., H.R. 6956, p. 96. However, it was also recognized that under the proposed legislation some railroad men might require moneys in addition to pensions and that therefore they should be permitted to find work after retirement. Hearing Before the Committee on Interstate and Foreign Commerce, House of Representatives, 75th Cong., 1st Sess., H.R. 6956, p. 75.

A compromise was arrived at whereby Congress gave expression both to the consideration that retirement benefits should be confined to those genuinely retired and to the countervailing consideration that some supplementation of retirement income through post retirement employment might be desirable. The former principle was expressed in the requirement of an absolute cessation of all gainful employment and the relinquishment of all right to return to such employment if such right existed, viz., Sections 2(a), 2(b); the latter was expressed in the provision permitting such employment as the annuitant might be able to find from sources other than the person or persons by whom he was employed at the time his annuity began to accrue: viz., Section 2(d). House Report No. 1069 accompanying H.R. 7519, 75th Cong., 1st Sess., p. 4 (June 18, 1937). It will be noted that while Section 2(d) permits the annuitant to engage in employment after he has completely retired from the labor market, that employment may not be for the person or persons by whom he was employed at the accrual of his annuity.

It was believed that under employment conditions as they existed in 1937 individuals who gave up their then current employment and were not allowed to return thereto would not be likely to secure other jobs, and therefore the act was weighted on the side of requiring complete and permanent retirement from the labor market with maximum benefits possible for the dependent retired group. H.R. 6956, 75th Cong., 1st Sess., p. 96.

That the purpose behind this plan has been realized is indicated by the fact that the average age of retirement is now slightly over 68 even though the Railroad Retirement Act provides for retirement at age 65. Annual Report, Railroad Retirement Board 1956, p. 114. The realization that a retirement at 65 years of age will result in an income reduction causes a substantial number of railroad employees to continue to engage in railroad service. As a consequence, the postponement of retirement results in a saving to the railroad retirement fund of an estimated $65,000,000 annually. Hearings Before Subcommittee of the Senate Committee on Interstate Commerce, 76th Cong., 1st Sess., on S. 1112, pp. 11, 14–15.

If an employee could obtain non-railroad employment before retiring and could retire from railroad employment with the assurance that he could keep such job with its additional income, the employee doubtless would hasten his retirement. The result of this would obviously be a diminution of the available fund or a revision in tax rates levied for the support of retirement benefit payments. It is therefore clear to us that Congress could not have intended the exception engrafted upon the Railroad Retirement Act by the court below.

■ We conclude therefore that Bush's employment by the Paper Company fell within the concept of compensated services as that phrase is employed in the Railroad Retirement Act. Bush rendered such compensated service to the Paper Company prior to the accrual of his annuity and continued such service while receiving his annuity. Having failed to cease his compensated service upon the accrual of his annuity, Bush was ineligible to receive the payments. Accordingly the judgment of the district court will be reversed.