Albert A. LEWIS et al., Plaintiffs,

v.

James L. COHEN et al., Defendants.

No. 73-2876.

United States District Court,
E. D. Pennsylvania.

March 5, 1976.

David F. Binder, of Raynes, McCarty & Binder, Philadelphia, Pa., for plaintiffs.

Robert E. J. Curran, U. S. Atty., Kenneth A. Ritchie, Asst. U. S. Atty., E. D. Pa., Philadelphia, Pa., for defendants.

HIGGINBOTHAM, A. L. J.

## OPINION

### I. INTRODUCTION

Plaintiff, a retired male railroad employee, claims that a statute passed in 1945 is now in violation of the Fifth Amendment and is also in contravention of Title VII of the Civil Rights Act of 1964 because it permitted women with 30 years of railroad service to retire at age 60 with full benefits, while men with similar service would have their annuity partially reduced if they retired between the ages of 60 and 64. This precise issue was previously decided by me on April 22, 1975, when I granted defendant's Motion for Summary Judgment and held that the statute in issue, § 228b(a)(3) of the Railroad Retirement Act of 1937, as amended (hereafter "Act"), did not illegally discriminate against male railroad employees. See Memorandum Opinion, *Lewis v. Cohen,* Civil Action No. 73–2876 (E.D.Pa., filed April 21, 1975).

I would have preferred to not add to the litany of words[1] answering those percep-

---

[1] Brown, Emerson, Falk and Freedman, "The Equal Rights Amendment: A Constitutional Basis for Equal Rights for Women," 80 Yale L.J. 871 (1971) (hereafter "Brown"); Getman, "The Emerging Constitutional Principle of Sex-ual Equality," 1972 Sup.Ct.Rev. 157 (hereafter "Getman"); Johnston, "Sex Discrimination and the Supreme Court—1971–1974," 49 N.Y.U.L. Rev. 617 (1974) (hereafter "Johnston").

tions of some males who think that in some way they are now victims of monstrous injustice or unjustified "statutory favoritism"[2] whenever women today gain even some miniscule advantage over their male counterparts. But, due to an unfortunate administrative snafu, more now has to be written.

When my opinion of April 21, 1975 was filed, I was not aware of the fact that plaintiff's counsel had filed[3] with the Clerk's Office the deposition of Dr. Herman P. Miller. Dr. Miller, a distinguished statistician, had submitted data suggesting that there was no rational basis in fact for the legislation passed in 1945 which gave women an advantage in earlier retirement benefits.[4] No copy of Dr. Miller's deposition was forwarded to my office by either counsel for the plaintiff or the Clerk's Office. Thus, appropriately, plaintiff's counsel has filed a petition asking that I reconsider my opinion in view of Dr. Miller's deposition.

Dr. Miller's deposition, and plaintiff's extensive legal argument now based thereon, concern basic perceptions of the status of women in 1945 when the legislation was passed. Were women generally, or at least in the railroad industry, truly on parity with men in terms of employment opportunities? Did they really have equal opportunity for advancement? Was 30 years labor in the railroad industry "harder on women than on men"?[5] On the basis of the data *then* available, could Congress rationally find that there was a disparity in the treatment of women and/or discrimination against women in the railroad industry? Upon making such finding of disparity or discrimination or greater wear, could Congress deal with such disparities by passage of an act giving women slightly advantageous retirement benefits as are reflected in the amended 1937 Act?

Having pondered these additional questions raised by plaintiff's Petition for Reconsideration, I again conclude that the statute in question is clearly constitutional and hence there is no need for the appointment of a three-judge court to determine its validity.

## II. LEGISLATIVE HISTORY

§ 228b of the Railroad Retirement Act of 1937, as amended, provided that "women who will have attained the age of sixty and will have completed thirty years of service" shall be eligible for full retirement benefits, but that each man "who will have attained the age of sixty and will have completed thirty years of service" will have his annuity "reduced by 1/180 for each calendar month that he . . . is under age sixty-five when the annuity begins to accrue."[6]

---

2. Plaintiff's Brief in Support of Motion for Reconsideration, 13.

3. Plaintiff filed Dr. Miller's deposition with the Clerk's Office on April 15, 1975.

4. Dr. Miller, in light of his statistical analysis, concluded that:

 [Women] are healthier. They find it easier to get a job and they can continue to work, their ability to continue to work is probably better than older men in this age group, in the sixty-four-year-age group.
 Deposition of Dr. Herbert P. Miller, 38–39.

5. Letter from Kenneth A. Ritchie, Assistant United States Attorney, filed as a supplemental memorandum, to A. Leon Higginbotham, Jr., United States District Judge for the Eastern District of Pennsylvania, filed April 14, 1975, at 3. Mr. Ritchie's letter was an analysis of the testimony of Chairman Latimer before the House Committee on Interstate and Foreign Commerce. *See* Text, infra, at 1051.

6. § 228b, in pertinent part, reads:
 (a) The following-described individuals, if they shall have been employees on or after the enactment date, and shall have completed ten years of service, shall, subject to the conditions set forth in subsection (b)–(d) of this section, be eligible for annuities after they shall have ceased to render compensated service to any person, whether or not an employer as defined in section 228a(a) of this title (but with the right to engage in other employment to the extent not prohibited by subsection (d) of this section):
 1. Individuals who on or after the enactment date shall be sixty-five years of age or over.
 2. *Women who will have attained the age of sixty and will have completed thirty years of service.*
 3. *Men who will have attained the age of sixty and will have completed thirty years of service,* or individuals who will have attained the age of sixty-two and will have completed less than thirty years of service, *but the an-*

In 1973, the Commission on Railroad Retirement, established to study the problems and financial viability of the Railroad Retirement System, expressed the purposes of the Railroad Retirement Act:

The railroad retirement system was created in 1935 as a special benefit system for railroad workers. It is federally—administered but has always been self-supporting from contributions by the workers and the railroads. . . . The system has lacked a cléar set of objectives, delineating between the socially-weighted benefits provided under *a social insurance scheme* and those appropriated to a private industry supplementary pension plan. 1973 U.S.Cong. & Admin. News, p. 1649 (emphasis added).

The Railroad Retirement Act of 1937 provided for a system of annuity and not pension benefits. *Railroad Retirement Board v. Bates*, 75 U.S.App.D.C. 251, 126 F.2d 642, 645 (1942). The Act was weighted in favor of complete retirement upon receipt of annuity payments. *United States v. Bush*, 255 F.2d 791, 794 (3d Cir. 1958).[7] The annuities under the Act are paid from a fund to which "the employees and the railroads have contributed equally on all salaries of employees earned after December 31, 1936." The fund is set up on an actuarial basis. *Scott v. Railroad Retirement Board*, 227 F.2d 684, 686 (7th Cir. 1955).

There is an effort to operate the Railroad Retirement benefit system in tandem with the Social Security Act. "Historically, whenever social security benefits have been increased, railroad retirement benefits have also been increased comparably." 1973 U.S. Cong. & Admin.News, p. 1617. Consequently, annuity payments provided for under the Railroad Retirement Act *are not* the equivalent of payments made pursuant to a private pension plan.

The most important part of the legislative history of § 228b is the January 31, 1945 testimony of the then Chairman of the Railroad Retirement Board, Mr. Murray W. Latimer, before the House Committee on Interstate and Foreign Commerce. In the course of his testimony, Mr. Latimer noted that the purpose of "social insurance" such as that established in part by the Act was "that of providing security" through the "promise of fixed incomes." Hearings on H.R.1362 Before the Committee on Interstate and Foreign Commerce, 79th Cong., 1st Sess., pt. 1, at 134 (1945) (hereafter "Hearings"). Latimer rejected the concept of using "the retirement system as a regulator of the labor market" either through the provision of compulsory retirement at 65 or through allowance of retirement at an early age with full annuity benefits. Hearings, *supra*, at 135–136. Latimer's conclusion was founded, to some degree, on a consideration of "the experience in other retirement systems where annuities were available at an age below that at which workers normally cease to seek employment." That experience indicated that laborers retiring at an arbitrarily pegged early age not only remained in the labor market, but also were in a "preferred position." These individuals could "substantially increase their incomes" by "offering to take work at wages slightly under the prevailing rate" because of the security of an "assured income." Hearings; *supra*, at 135–36. After rejecting the notions identified above, Latimer discussed the suggested amendment of the Act's annuity provisions which allowed for the early retirement of women with full annuity benefits. The chairman maintained, as he had earlier in his testimony, that "special provision for women seems to me appropriate." Hearings, *supra*, at 136. The unavoidable inference from Latimer's testimony is that Congress was pro-

---

*nuity of such men or such individuals shall be reduced by 1/180 for each calendar month that he or she is under age sixty-five when the annuity begins to accrue.*
45 U.S.C. § 228b (emphasis added).

**7.** The conclusion of the Third Circuit is consistent with the testimony of Chairman Latimer

before the Committee on Interstate and Foreign Commerce, in which he contrasted the goal of annuity payments under the Act with the practice of some private pension plans. See Text, *infra*, at 1050–1051.

viding for the earlier retirement of women with full benefits at an age at which female workers "normally cease to seek employment," and not before.

In addition, Mr. Latimer commented on the low representation of women in the railroad industry:

> Women have, at least until recent years, been represented only to a minor degree in the railroad industry. Even among qualified workers in the benefit years 1943–44, women constituted slightly less than 4 percent. Hearings, *supra*, at 116.

The most critical portion of Mr. Latimer's testimony was his comment, as follows, on the suggested amendment to § 228b:

> [S]pecial provision for women is appropriate. There is much evidence that, despite the greater longevity of women as compared with men, their efficiency on jobs outside the home tends to become impaired at an earlier age than in the case of men. In its report for 1943, the Social Security Board stated that there was 'little doubt that the proportion of women unable to engage in regular employment at age 60 is larger than the proportion of men at age 65.' Most pension systems of private employers, having any substantial number of women workers, make provision for retiring women at an earlier age than male employees. The Social Security Board has recommended that income benefits for women under the old-age and survivors' insurance system begin at 60. The provision in H.R. 1362 does not go as far as the recommendation of the Social Security Board; I

think it an appropriately cautious step in the right direction. Because it fits, as far as it goes, the peculiar needs of women workers, it can hardly be said to involve any element of discrimination in favor of women over men. Hearings, *supra*, at 50.

Subsequent to Chairman Latimer's testimony, Congress enacted the statute now in issue.

## III. EQUAL PROTECTION CLAUSE— VARYING STANDARDS OF REVIEW

■ There has been a gradual evolution in the equal protection standards used by the Supreme Court in evaluating challenged state and federal legislation.[8] Commentators have dubbed the various doctrinal postures assumed by the Justices in their constitutional analyses the "old," "new," and "newer" equal protection tests.[9]

Under the "old" equal protection schema, a classification adopted by a state or national legislature had to be "reasonable, not arbitrary, and must rest upon some ground of *difference* having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike." *F. S. Royster Guano Co. v. Virginia*, 253 U.S. 412, 415, 40 S.Ct. 560, 561, 64 L.Ed. 989, 990 (1920) (emphasis added). Despite its initial holding that all similarly situated persons would receive equal treatment, the Supreme Court found it necessary to veer from a course consistent with its announced doctrine in order to avoid placing legislators in a "constitutional straitjacket." Consequently, the Justices found that a statute satisfied the requirements of the Equal Protection

---

**8.** The Court noted in *Weinberger v. Wiesenfeld*, 420 U.S. 636, 638, 95 S.Ct. 1225, 1228 n. 2, 43 L.Ed.2d 514, 519 (1975), that:

> [W]hile the Fifth Amendment contains no equal protection clause, it does forbid discrimination that is "so unjustifiable as to be violative of due process" [citations omitted]. This Court's approach to Fifth Amendment equal protection claims has always been precisely the same as to equal protection claims under the Fourteenth Amendment.

In this action, § 228b of the Railroad Retirement Act is alleged to violate the due process

clause of the Fifth Amendment. Since the standards of review are identical either under the Due Process or Equal Protection Clauses of the Fifth and Fourteenth Amendments respectively, then any comments on the development of equal protection doctrine are pertinent here.

**9.** See Gunther, "The Supreme Court 1971 Term—In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection," 86 Harv.L.Rev. 1 (1972) (hereinafter "Gunther"); cf. Note, "Developments In the Law—Equal Protection," 82 Harv.L.Rev. 1065 (1969) (hereinafter, "Developments").

Clause once the mere rationality of its classifications was demonstrated. Any legislative line-drawing, not involving race or touching upon interests like voting or travel, was valid under the "old" test so long as the distinctions were rationally supportable. The constitutionality of a legislative act was not dependent upon a detailed statutory history revealing the purpose for the classifications embodied therein. In fact, a statute could withstand an equal protection attack even if the statutory history was silent with respect to the legislative purpose. The result of the Court's attempt to balance the need for equal treatment of persons similarly situated against the necessity for legislative classifications was that a statute was invalidated for abridging the Equal Protection Clause only if "no ground" could be "conceived" to justify the distinctions embodied therein. *McDonald v. Board of Election Commissioners*, 394 U.S. 802, 809, 89 S.Ct. 1404, 1409, 22 L.Ed.2d 739, 746 (1969). This extreme deference to legislative judgments, upon a showing of the rationality of the classifications, prompted one constitutional scholar to remark that legislation was accorded only "minimal scrutiny in theory and virtually none in fact." [10]

Some legislative classifications, namely those considered invidious, prompted detailed scrutiny by the Court before it upheld or struck down a statute on equal protection grounds. The "new" equal protection analysis was called for either when the legislature made a distinction among persons on the basis of race or alienage, or when an interest of sufficient importance, e. g., voting or travel, was impeded by a legislative differentiation. The reasonableness of a statutory measure and some laudable objective for its enactment were insufficient, without more, to secure the statute against constitutional assault. The classification would stand only if the proponent of the statute could demonstrate that it served a compelling interest that could not be achieved in other ways.[11] The legislature was relegated to a much narrower battleground in its attack on social and/or economic ills. Not only was the court unwilling to *imagine* rationales for the classification in issue, but also the classification must have been a *necessary* means of achieving the purpose the statute was designed to implement. Consequently, the statute must have neither imposed burdens nor bestowed benefits on more individuals than were essential to accomplish the purposes of the act. At the same time, the classifications could not result in the exclusion of individuals similarly situated who should have been benefited or burdened depending on the over-all design of the challenged statute. Unlike the analysis sketched in *Jefferson v. Hackney*, 406 U.S. 535, 92 S.Ct. 1724, 32 L.Ed.2d 285 (1972), where the legislature was entitled to partially address a particular problem,[12] here the legislature could fall neither wide nor short of the designated purpose and hope to pass strict constitutional muster. Professor Gunther maintained

---

10. Gunther, supra note 9, at 8.

11. See *Loving v. Virginia*, 388 U.S. 1, 11, 87 S.Ct. 1817, 1823, 18 L.Ed.2d 1010, 1017 (1967) where the Court held:

At the very least, the Equal Protection Clause demands that racial classifications, especially suspect in criminal statutes, be subjected to the 'most rigid scrutiny,' . . . and, if they are ever to be upheld, they must be shown to be *necessary* to the accomplishment of some permissible state objective, independent of the racial discrimination which it was the object of the Fourteenth Amendment to eliminate. (emphasis added)

12. In *Jefferson*, the Supreme Court considered the constitutionality of Texas' welfare computation formulas. The State constitution set a ceiling on state-financed welfare grants which fell short of the level of federally-computed relief available through categorical assistance programs. In order to bridge the gap, the State computed the recipient's level of need under the federal formulas and then reduced that figure by a given percentage. While the aged, the blind and the disabled received from ninety-five to one-hundred percent of the relief computed under the federal formula, dependent children received only seventy-five percent of their federal entitlement. A majority of the Justices found that the State could partially assist some individuals qualifying for categorical assistance while wholly meeting the federally-determined needs of others, without infringing the requirements of the Constitution.

that the "new" equal protection mode of evaluation resulted in judicial scrutiny which was "'strict' in theory and fatal in fact." [13]

The polarity of the "old" and "new" equal protection tests was disturbed when the "newer" constitutional theory was formulated in *Reed v. Reed*, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971), which will be discussed later in this opinion, and in *Eisenstadt v. Baird*, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972). *Eisenstadt* involved an equal protection challenge to a conviction under a Massachusetts statute which prohibited the distribution of contraceptives to unmarried individuals by persons authorized to distribute drugs. While the Court recognized that the object of such legislation, consistent with the Equal Protection Clause, could have been the deterrence of premarital sex, it rejected that proposition as one that could not "reasonably be regarded as the purpose of the Massachusetts law." *Eisenstadt, supra*, 405 U.S. at 448, 92 S.Ct. at 1035, 31 L.Ed.2d at 359. Rather than accepting *any imagined rational purpose* for a legislative classification, the Court conducted an inquiry into the *actual purposes* of the legislation. Unlike the "new" equal protection test, here there was no requirement that the classification selected be the least drastic alternative for achieving a legislative purpose. No compelling interest was required for upholding the statute as constitutional. However, under the "newer" equal protection format, the Court required that the legislative purpose "have substantial basis in actuality, not merely in conjecture." [14]

The "newer" equal protection doctrine may, in fact, constitute nothing more than an infusion of new resolve into the original or "old" equal protection test defined in *F. S. Royster Guano Co.*[15] Whether the "newer" equal protection doctrine imports that the Supreme Court has come full circle in its constitutional analysis or not, it is important to recognize that the three standards sketched above are being applied concurrently. The "newer" equal protection doctrine does not spell the death either of strict judicial scrutiny or of mere rationality.[16]

One question for decision in this case is which of the above standards is applicable in my evaluation of § 228b of the Railroad Retirement Act. A review of the Supreme Court's recent decisions in cases where classifications were allegedly based on sex will aid in arriving at an answer to the above question.

---

13. Gunther, supra note 9, at 8.

14. Gunther, supra note 9, at 21.
 The genesis of the "newer" equal protection analysis was foreshadowed in a note discussing the preferred standard of review for scrutinizing "benign" racial classifications. See definition of the term "benign racial classifications," Text, infra, at 41 n. 32. The author of the note postulated that the courts had to determine the actual purpose of the allegedly benign statute and, for this purpose, courts should use the following standard of review:
 Unlike a court applying the classic permissive standard of review, a court here would not be concerned with finding *any conceivable purpose*, but would be concerned with determining, from among the class of conceivable purposes, [for the legislative classification], *whether the predominant purpose is non-invidious.*
 Developments, supra note 9, at 1115 (emphasis added).

15. Professor Gunther maintains that the "newer" equal protection analysis:

. . . would have the Court take seriously a constitutional requirement that has never been formally abandoned: that legislative means must substantially further legislative ends. The equal protection requirement that legislative classifications must have a substantial relationship to legislative purposes is, after all, essentially a more specific formulation of that general principle.
Gunther, supra note 9, at 20. The "newer" equal protection analysis, in effect, raises the level of inquiry from "virtual abdication to genuine judicial inquiry." Gunther, supra note 9, at 24.

16. "That expanded reasonable means inquiry [newer equal protection evaluation] would not mean the end of strict scrutiny. In the context of fundamental interests or suspect classifications, the Court would continue to demand that the means be more than reasonable—e. g., that they be 'necessary,' or the 'least restrictive' ones."
Gunther, supra note 9, at 24.

## IV. THE CHANGE IN JUDICIAL ATTITUDES TOWARD WOMEN

Just as constitutional doctrines develop over time, so too, societal perceptions are altered and reformulated over a span of years. Views of societal structure are reflected in our judicial decisions, so that any consideration of the Supreme Court's recent decisions regarding alleged sex discrimination must begin with a consideration of the Court's changing attitude toward women. The United States Supreme Court in decades past has sanctioned patent deprivations of opportunity for women. Thus Myra Bradwell was denied admission to the bar of the State of Illinois in 1872 solely because she was a woman.[17] Except for Chief Justice Chase, all of the Justices felt that the denial of her admission to the bar did not violate her federal constitutional rights. Justice Bradley felt compelled to add a concurring opinion:

On the contrary, the civil law, as well as nature herself, has always recognized a wide difference in the respective spheres and destinies of man and woman. Man is, or should be, woman's protector and defender. The natural and proper timidity and delicacy which belongs to the female sex evidently unfits it for many of the occupations of civil life. The constitution of the family organization, which is founded in the divine ordinance, as well as in the nature of things, indicates the domestic sphere as that which properly belongs to the domain and functions of womanhood. The harmony, not to say identity, of interests and views which belong or should belong to the family institution, is repugnant to the idea of a woman adopting a distinct and independent career from that of her husband. So firmly fixed was this sentiment in the founders of the common law that it became a maximum of that system of jurisprudence that a woman had no legal existence separate from her husband, who was regarded as her head and representative in the social state; and, notwithstanding some recent modifications of this civil status, many of the special rules of law flowing from and dependent upon this cardinal principle still exist in full force in most states. . . . The paramount destiny and mission of woman are to fulfill the noble and benign offices of wife and mother. This is the law of the Creator. And the rules of civil society must be adapted to the general constitution of things, and cannot be based upon exceptional cases.

*Bradwell v. State of Illinois,* 83 U.S. 130, 139 (16 Wall), 21 L.Ed. 442, 446 (1873).

However, the Court,[18] by 1973, had adopted a different stance toward the female population of the United States. In *Frontiero v. Richardson,* 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973), four Justices noted that Thomas Jefferson believed that "women should be neither seen nor heard in society's decisionmaking councils."[19] In response to Jefferson's admonition, the Court stated that " . . . our Nation has had a long and unfortunate history of sex discrimination" which has been "rationalized by an attitude of 'romantic paternalism' which, in practical effect, put women, not on a pedestal, but in a cage." 411 U.S. at 684, 93 S.Ct. at 1769, 36 L.Ed.2d at 590. As late as 1974, in *Kahn v. Shevin,* 416 U.S. 351, 353, 94 S.Ct. 1734, 40 L.Ed.2d 189 (1974), the Supreme Court recognized without equivocation:

Whether from overt discrimination or from the socialization process of a male dominated culture, the job market is in-

---

**17.** A refined reading of the majority opinion might suggest that if Myra Bradwell had not been married, the Illinois court would not have precluded her admission to the bar of that state.

**18.** Although only four Justices, in the plurality decision in *Frontiero,* held that sex-based classifications were "inherently suspect," Justice Stewart, in his concurring opinion, relied on *Reed v. Reed,* supra, to find that the classification under consideration in *Frontiero* worked an "invidious discrimination." *Reed* also demonstrated a new judicial attitude toward women. *See infra,* at 1056 n. 21. Thus, the statement in the Text above applies to a majority of the Justices on the Supreme Court.

**19.** *Frontiero,* supra, 411 U.S. at 684, 93 S.Ct. at 1769 n. 13, 36 L.Ed.2d at 590.

hospitable to the woman seeking any but the lowest paid jobs.

A good summation of the change in national attitudes on sex discrimination was written by Professor Julius Getman. After noting the inclusion of sex discrimination among those acts prohibited by Title VII of the Civil Rights Act of 1964, the proliferation of comparable state legislation, and the passage of the Equal Rights Amendment by the House and the Senate, Professor Getman concluded that:

> [D]istinctions based on the concept of separate spheres [for males and females] has become much less consistent with the general fabric of our legal system. Getman, *supra* note 1, at 164 (footnote omitted).

## V. SEX–BASED CLASSIFICATIONS UNDER THE EQUAL PROTECTION AND DUE PROCESS CLAUSES

Each of the equal protection tests articulated earlier in this opinion has been applied in the sex discrimination area. As of late, the Court, in a majority of cases evaluating alleged sex-based classifications, has required that the statutory distinctions bear more than a mere rational relationship to the purpose of the legislation.[20]

An abandonment of the "old" equal protection test in the area of sex-based classifications was first indicated in *Reed v. Reed, supra.* There the Supreme Court considered two sections of the Idaho code providing for the mandatory appointment of male over female applicants for the position of administrator of an intestate estate. The females disfavored by the Idaho legislature were equally entitled to receive the appointment, standing in the same relationship to the decedent as their preferred male counterparts. The Supreme Court found that the Idaho legislature had divided members of the same relationship class into subclasses on the basis of sex, and that the latter categorization was subject to scrutiny under the Equal Protection Clause of the Fourteenth Amendment. The Court, in a unanimous opinion, concluded that the "arbitrary preference established in favor of males in the Idaho Code" was invalid. Chief Justice Burger, in his opinion for the Court, acknowledged that there was a rational basis for the statute in question:

> Clearly the objective of reducing the workload on probate courts by eliminating one class of contests *is not without some legitimacy.* The crucial question, however, is whether § 15–314 advances that objective in a manner consistent with the command of the Equal Protection Clause. We hold that it does not. To give a mandatory preference to members of either sex over members of the other, *merely to accomplish the elimination of hearings on the merits,* is to make the very kind of arbitrary legislative choice forbidden by the Equal Protection Clause of the Fourteenth Amendment; *and whatever may be said as to the positive values of avoiding intrafamily controversy, the choice in this context may not lawfully be mandated solely on the basis of sex.*
> 404 U.S. at 76, 92 S.Ct. at 254, 30 L.Ed.2d at 230 (emphasis added).

At first glance, it may appear that *Reed* applies only the rational relationship test appearing in *F. S. Royster Guano Co.* However, upon closer examination it becomes evident that, *despite the showing of a rational basis for the classification,* the Court concluded that the legislative decision

---

**20.** Justice Brennan, in his dissenting opinion in *Geduldig v. Aiello,* supra, maintained that the majority had returned to the "traditional" equal protection analysis in that action. In any event, the majority in Geduldig refused to evaluate the disability insurance program in light of its decisions in *Reed v. Reed* and *Frontiero v. Richardson,* but rather held that no sex-based classification was included within the statute and, that the statute merely differentiated between pregnant persons and non-pregnant persons, the latter category including both males and females. The majority found that the exclusion of normal pregnancies from the list of disability entitlements was justified by the State's goal to provide the maximum coverage available for persons at even the lowest income levels without increasing deductions from potential beneficiaries' salaries. For a discussion of the facts in Geduldig, see Text, infra, at 1055–1056.

was arbitrary.[21] The Court's requirement that sex-based classifications bear more than a mere rational relationship to the purpose of the statute is further evidenced by an examination of the Court's decisions in cases where sex-based classifications were challenged under another amendment to the Constitution.[22]

In an opinion by Justice Blackmun, the Court held that the standard articulated in *Reed* was controlling in *Stanton v. Stanton*, 421 U.S. 7, 95 S.Ct. 1373, 43 L.Ed.2d 688 (1975). In that case a Utah statute establishing differing ages of majority for males and females resulted in the withdrawal of support payments from a female child at age 18, whereas a male child was entitled to receive court-decreed support payments until he reached his later age of majority—21 years. The Court refused to decide whether sex should be considered an "inherently suspect" classification subject to "strict" scrutiny under the Equal Protection Clause. Nonetheless, the Court subjected the statute, as one which accorded different treatment on the basis of sex, to the scrutiny required by *Reed.* The distinction in support obligations on the basis of the child's sex had to bear a "fair and substantial relation" to the object of the majority age statute. The Utah Supreme Court had postulated that the purpose of the majority statute was to provide parental support for male children during their education and

21. Professor Gunther concluded that it was difficult to understand the decision in *Reed v. Reed*:

. . . without an assumption that some special sensitivity to sex as a classifying factor entered into the analysis. Clear priority classifications are plainly relevant to the State's interest in reducing administrative disputes. Even if the requirement be that the means bear a 'significant relationship' to the state's purpose, or contribute substantially to its achievement, the test would seem to have been met in *Reed.* Only by importing some special suspicion of sex-related means from the equal protection area can the result be made entirely persuasive. Yet application of new equal protection criteria is precisely what *Reed v. Reed* purported to avoid.

Gunther, supra note 2, at 34. (footnotes omitted).

Another view of the change in the Supreme Court's treatment of cases where sex discrimination is alleged is found in an article by Professor Getman. He argues that:

The decisions in *Reed* and *Stanley* [*Stanley v. Illinois* ] demonstrate that the Court can significantly alter the constitutional importance of sexual equality without formally changing the standard of review under the Fourteenth Amendment. The traditional tests under the Fourteenth Amendment have always left considerable discretion to the Court through the technique of defining the statute's purpose. If the purpose is described narrowly in terms of the immediate ends which a statute seeks to achieve, then distinctions which serve peripheral or secondary goals may be held improper. Thus, the statute in *Reed* was described as a way to resolve disputes about administration. Differentiation between the sexes was neither necessary nor directly related to the purpose. It also could have been characterized as seeking to resolve disputes without disturbing interfamily harmony. Getman, supra, at 162.

Getman's analysis is analogous to that of Gunther, *i. e.,* that the Court under the "traditional" or "old" equal protection test, validated statutes by defining—"imagining"—a purpose for the statute which may or may not have had support in the legislative history.

22. A dramatic shift in the Court's sensitivity to sex-based classifications and the resultant change in the applicable standards for evaluation of the same is demonstrated by comparison of the Court's opinions in *Hoyt v. Florida*, 368 U.S. 57, 82 S.Ct. 159, 7 L.Ed.2d 118 (1961) and *Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1974).

In *Hoyt v. Florida*, the Court held that a system under which women were automatically excluded from juries unless they volunteered for service did not constitute a denial of due process or equal protection, because there was a "sufficient rational basis" for the exemption. The Court also found that the extension of the exemption to include unmarried females was valid for reasons of administrative convenience. By contrast, in *Taylor*, the Court rejected the administrative convenience argument and found that exclusion of women from jury panels was a violation of a criminal defendant's Sixth Amendment right to a trial by an impartial jury drawn from a fair cross-section of the community. The Court further held that:

The right to a proper jury *cannot be overcome on merely rational grounds.* There must be weightier reasons if a distinctive class representing 53% of the eligible jurors is for all practical purposes to be excluded from jury service. No such basis has been tendered here. (footnotes omitted) 419 U.S. at 534, 95 S.Ct. at 699, 42 L.Ed.2d at 700. (emphasis added).

training. The Court invalidated the statute on the grounds that "no valid distinction" could be drawn between male and female children in the support payment context. It found that the reasons posed by the Utah Supreme Court for the statutory distinction—that males should have the opportunity to complete their education and training before undertaking their primary responsibility of making a home, and that females mature and marry earlier than males—were insufficient, assuming the truth of the assertions, to sustain the statute against equal protection attack.

The Court invalidated federal legislation in *Weinberger v. Wiesenfeld,* 420 U.S. 636, 95 S.Ct. 1225, 43 L.Ed.2d 514 (1975), when it reviewed a provision of the Social Security Act under which widows but not widowers were entitled to survivor's benefits based on the earnings of a deceased spouse. Although the opinion made reference to *Frontiero v. Richardson, supra,* a plurality decision in which sex was defined as a "suspect classification", there was no reliance on that doctrine in the *Weinberger* decision. Instead, the Court concluded that the denial of benefits to male surviving spouses under the Social Security Act was rooted: (1) in the presumption that males rather than females were primarily responsible for the support of their spouses and children; and (2) in the presumption that females were apt to forego work in order to care for their children whereas men were not. The Court reached this result after a detailed inquiry into the legislative history in an effort to discern the primary purpose underlying the statute under attack. The government argued that the classification was "reasonably designed to compensate women beneficiaries as a group" for difficulties still incurred in attempting to support themselves and their families. 420 U.S. at 648, 95 S.Ct. at

1233, 43 L.Ed.2d 514 at 524. The Court rejected that possibility, not as an impermissible legislative goal, but as one belied by a clear legislative history. Finding that the purpose of the statute was to enable "the surviving parent to remain at home to care for a child" the Court held that "the gender-based distinction of § 402(g)" of the Social Security Act was "entirely irrational." [23] 420 U.S. at 653, 95 S.Ct. at 1235, 43 L.Ed.2d at 528. The preclusion of survivors' benefits for male spouses under the Social Security Act resulted in a "denigration of the efforts of women who do work and whose earnings contribute significantly to their families' support." 420 U.S. at 646, 95 S.Ct. at 1232, 43 L.Ed.2d at 523. Furthermore, the provision deprived women of the protection for their families available, solely by virtue of employment, to males.

The Court has also found statutes *constitutional* upon application of the "newer" equal protection test in the sex discrimination area. In *Kahn v. Shevin, supra,* the Court considered a Florida property tax statute under which widows were entitled to an exemption of $500. No such exemption was provided for widowers such as the appellant. After recounting the economic disadvantages suffered by women—*e. g.,* their disproportionate concentration in lower paid jobs, the increase in the median income gap between males and females, and the salary differential between men and women in professional, managerial and technical positions—the Court concluded that the statute bore a "fair and substantial relation to the object of the legislation." 416 U.S. at 355, 94 S.Ct. at 1737, 40 L.Ed.2d at 193. That object, as viewed by the Florida Supreme Court, was to reduce the "disparity between the economic capabilities of a man and a woman." 416 U.S. at 352, 94 S.Ct. at 1736, 40 L.Ed.2d at 192.

---

**23.** Although it is true, as the majority maintained in *Frontiero,* 411 U.S. at 684, 93 S.Ct. at 1769, 36 L.Ed.2d at 590, that *Reed* was a "departure from 'traditional' rational-basis analysis with respect to sex-based classifications," *Reed* did not require that the proponent of the statute demonstrate that it was the least drastic alternative to accomplish a valid legislative

purpose. This requirement, which signals a "suspect classification" designation, was also not imposed in *Weinberger v. Wiesenfeld.* In *Weinberger,* the Court merely concluded that the legislative classification was "irrational" in the same off-hand fashion that it declared that the line-drawing in *Reed* was "arbitrary." 411 U.S. at 683, 93 S.Ct. at 1769, 36 L.Ed.2d at 590.

In *Schlesinger v. Ballard*, 419 U.S. 498, 95 S.Ct. 572, 42 L.Ed.2d 610 (1975), the Supreme Court held that a statutory scheme, which accorded to women naval officers a thirteen year tenure of commissioned service before mandatory discharge for want of promotion, was valid even though it required the mandatory discharge of male officers who were twice passed over for promotion, but who might have less than thirteen years of commissioned service. The Court held that the statute was sustainable because of "the demonstrable fact that male and female line officers in the Navy are *not* similarly situated with respect to opportunities for professional service." 419 U.S. at 508, 95 S.Ct. at 577, 42 L.Ed.2d at 618.

One source of confusion in determining the applicable standards for review in the sex discrimination area has been the Court's tendency to treat some pregnancy benefit cases as due process rather than equal protection problems. In *Cleveland Board of Education v. LáFleur*, 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974) (hereafter *"LaFleur"*), the Court considered the constitutional validity of the mandatory pregnancy leave-without-pay requirements of two boards of education. The Cleveland School Board, unlike the Virginia board: (1) made no guarantee of reemployment following the birth of the child; and (2) forbade the teacher from returning to work until the beginning of the full semester following the date when her child attained the age of three months. The Court, in an opinion written by Mr. Justice Stewart, held that the mandatory leave provisions of both school boards constituted violations of the Due Process Clause of the Fourteenth Amendment. The leave requirements infringed upon "freedom of personal choice in matters of marriage and family life" without any individual determination of a pregnant woman's inability to continue her work. 414 U.S. at 639, 94 S.Ct. at 796, 798, 39 L.Ed.2d at 60. This same analysis was applied in *Turner v. Department of Employment Security and Board of Review of the Industrial Commission of Utah*, 423 U.S. 44, 96 S.Ct. 249, 46 L.Ed.2d 181 (1975), a *per*

*curiam* opinion, in which the Supreme Court held that a Utah statute withholding unemployment compensation benefits from women beginning twelve weeks prior to childbirth until the sixth week following childbirth was unconstitutional. The Court found that the *conclusive presumption* that pregnant women, or those having recently gone through childbirth, were unable to work violated the Due Process Clause of the Fourteenth Amendment. The state was required to achieve its legitimate objectives not through the vehicle of conclusive presumptions but rather "through more individualized means when basic human liberties are at stake." 423 U.S. at 46, 96 S.Ct. at 251, 46 L.Ed.2d at 184.

However, just as in *Reed v. Reed*, the majority in *LaFleur* found that the leave provisions were "arbitrary" and had "no rational relationship to the valid state interest of preserving continuity of instruction." *LaFleur, supra,* 414 U.S. at 643, 94 S.Ct. at 798, 39 L.Ed.2d at 62. At the same time the majority upheld the boards' advance notice requirements as "rational" and perhaps "well . . . necessary to serve the objective of continuity of instruction." *LaFleur, supra,* 414 U.S. at 642, 94 S.Ct. at 797, 39 L.Ed.2d at 61.

As Justice Powell pointed out in his concurrence in *LaFleur*, perhaps an equal protection analysis should have been used. The doctrinal overlap is most apparent upon review of several sex discrimination cases decided upon equal protection grounds. In *Frontiero v. Richardson*, the Court confronted a *presumption* that women were completely dependent upon their husbands. This presumption was thought by the government to supply sufficient justification for the requirement that servicewomen prove that they supplied more than one-half of the support for their husbands in order to qualify for additional benefits. In *Weinberger v. Wiesenfeld*, the Social Security section under attack was based on two presumptions, one of which was "that men are more likely than women to be the primary supporters of their spouses and children." Finally, in *Geduldig v. Aiello*, 417 U.S. 484,

94 S.Ct. 2485, 41 L.Ed.2d 256 (1974), the Court considered the exclusion of normal pregnancy from the list of disabilities compensable under California's disability insurance program. The Court applied the Equal Protection Clause, rather than the Due Process Clause used in *LaFleur,* and found that California statute was constitutionally valid.

All of the sex-related classifications challenged in the cases cited either in the footnotes or in the body of this opinion involve the same "difficulty"—legislators' propensity to classify individuals according to sex. See *Johnston,* "Sex Discrimination and the Supreme Court—1971–1974," 49 N.Y.U.L. Rev. 617, 660–661 (1974), where it is argued that "each of the laws and regulations invalidated in the four cases [*Reed, Frontiero, LaFleur* and *Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972)] was an integral part of a vast mosaic of government-imposed sex-role stereotyping"; cf. Comment, "*Geduldig v. Aiello* : Pregnancy Classifications and the Definition of Sex Discrimination," 75 Colum.L. Rev. 441 (1975).

It is apparent from examining these cases that there is little, if any, distinction between the due process and equal protection standards variously applied by the Court in sex discrimination cases.

In *Frontiero v. Richardson, supra,* four of the Justices, in a plurality opinion, reached the zenith in their scrutiny of sex-based classifications and denominated such as "inherently suspect" and "subject to close judicial scrutiny" in accordance with the "new" equal protection requirements. The rationale for placing a specific legislative judgment in a suspect category is that the characteristic is an immutable factor of birth which frequently bears no relationship to an individual's ability to perform in a given situation.[24]

In *Frontiero,* the Court considered the challenge that servicewomen were accorded less favorable treatment than servicemen. The latter could automatically receive increased housing and medical benefits for their spouses, while the former could receive such benefits only if it were shown that one-half of the husband's support had been provided by the servicewoman. Justices Brennan, Douglas, White and Marshall disagreed with the district court's conclusion that the distinction between male and female service personnel was justified on the basis of the presumed roles of the husband as the "breadwinner" and the wife as "dependent" partner. These same Justices, in footnote 22, carved out an implied exception for sex-based classifications which were "designed to rectify the effects of past discrimination against women." *Frontiero, supra,* 411 U.S. at 689, 93 S.Ct. at 1771 n. 22, 36 L.Ed.2d at 593. Justice Brennan suggested that the statutes in issue in *Frontiero* "seize[d] upon a group—women— who have historically suffered discrimination in employment, and rely on the effects of this past discrimination as a justification for heaping on additional economic disadvantages." *Id.* The Supreme Court in *Kahn v. Shevin, supra, Stanton v. Stanton, supra, Weinberger v. Wiesenfeld, supra,* and *Schlesinger v. Ballard, supra,* refused to or refrained from denominating sex-based classifications as "inherently suspect." Thus, given the current doctrinal posture of the Supreme Court, I do not view the "close judicial scrutiny" standard as appropriate for use in determining the constitutionality of § 228b.

## VI. APPLICATION OF THE EQUAL PROTECTION CLAUSE TO SECTION 228b

The plaintiff in this case would liken § 228b of the Railroad Retirement Act to the statutes involved in *Reed, Stanton,* and *Weinberger* by asserting that the statute in this case, just as in those cases reviewed above, was premised on assumptions about the relative sex-roles of males and females in American society.

A consideration of the legislative history of § 228b demonstrates the inapplicability of the holdings in those three cases. Under

**24.** Developments, supra note 9, at 1124–27.

the "newer" equal protection test applied in *Reed*, the Court conducted an in depth inquiry into the challenged statute's legislative history in order to ascertain its actual purpose. That same standard of review was applied in *Stanton*. However, in *Stanton* the Justices were faced with a state statute for which there was "little or no legislative history." [25] Furthermore, the Utah Supreme Court had interpreted the statute under review in *Stanton* as one based on "old notions" of "man's primary responsibility to provide a home and its essentials," the male's need for a "good education and/or training" to fulfill that role, and the need for parental support during that apprentice period. In contrast, females were perceived as maturing more quickly, as candidates for an earlier marriage, and, thus, not in need of support payments. 421 U.S. at 10, 95 S.Ct. at 1375–76, 43 L.Ed.2d at 692.

Unlike the Court in *Stanton*, I have the advantage of a developed legislative history to assist in my determination whether § 228b is consistent with the Equal Protection Clause. The legislative history does

**25.** *Stanton, supra*, 421 U.S. at 9, 95 S.Ct. at 1375, 43 L.Ed.2d at 692, n.**.

**26.** The provision in question, amending Sections 303, 304 and 305 of the Railroad Unemployment Insurance Act, provided:

> Section 303. The first paragraph of subsection 1(k) is amended by inserting . . . (2) a "day of sickness", with respect to any employee, means a calendar day on which because of any physical, mental, psychological, or nervous injury, illness, sickness, or disease he is not able to work *or which is included in a maternity period*, and with respect to which (i) no remuneration is payable or accrues to him, (ii) in accordance with such regulations as the Board may prescribe, a statement of sickness is filed within such reasonable period, not in excess of ten days, as the Board may prescribe:

> . . . . .

> Section 304. (1–2) The term "maternity period" means the period beginning fifty-seven days prior to the date stated by the doctor of a female employee to be the expected date of the birth of the employee's child and ending with the one hundred and fifteenth day after it bgeins [sic] or with the thirty-first day after the day of the birth of the child, whichever is later.

not rely on "old notions" about the role of women in support of their differential treatment under the legislative act. Instead, through the testimony of Chairman Latimer, the legislative history discloses that the statute was premised, in part, on the greater proportion of women unable to continue to work at age 60 as compared with men unable to continue to work at age 65. Furthermore, Congress explicitly considered the possibility that such legislation might discriminate in favor of women over men. Chairman Latimer, in his testimony, had raised and rejected such a notion because women had "peculiar needs," Hearings, *supra*, at 50, and thus they were not "similarly situated." The legislative history also discloses that the retirement age for women was not fixed below that at which women felt it necessary to withdraw from the labor market. See Text, *supra*, at 1050–1051.

Rather than promoting the role of women as "homemaker" and their exit from the job market, the Railroad Unemployment Insurance Act, amended by the same bill which amended the statute in issue in this case, provided maternity benefits for female employees before and after childbirth.[26] The

> . . . . .

> Section 305. The amount of benefits payable for the first fourteen days in each maternity period, and for the first fourteen days in a maternity period after the birth of the child, shall be one and one-half times the amount otherwise payable under this subsection. Benefits shall not be paid for more than eighty-four days of sickness in a maternity period prior to the birth of the child. Qualifications for and rate of benefits for days of sickness in a maternity period shall not be affected by the expiration of the benefit year in which the maternity *period will have begun unless in such benefit* year the employee will not have been a qualified employee. In computing benefits to be paid, days of unemployment shall not be combined with days of sickness in the same registration period. Hearings, supra, at 13–14 (emphasis added).

In light of the Court's holding in *La Fleur*, the establishment of a fixed time at which pregnant women had to cease work in order to qualify for maternity benefits, was a violation of the Due Process Clause. However, it is important to note, that the statute, enacted prior to the change in the Court's attitude toward women, compelled females desirous of

rationale for provision of maternity benefits was articulated again by Chairman Latimer:

"It is decidedly against the national interest for expectant mothers either to engage in employment practically up to the time of childbirth *or to return quickly* to employment after childbirth. Provision for income which will enable expectant mothers to safeguard the health of their children both before and after birth, is of the utmost importance. H.R. 1362 proposes to provide incomes both to workers who become sick and to female employees who are expectant mothers or who have just given birth to children." Hearings, *supra,* at 77.

The Railroad Unemployment Insurance Act provided for benefits during a limited term, from 57 days prior to the child's expected date of birth to the 115th day after benefits commenced or until the 31st day after the birth of the child, whichever was later. The only possible inference from the discontinuation of benefits after a given term was that the female employee, although not to return to work "quickly", was expected to resume her job at some point in time.

It is evident from a review of the relevant legislative history that § 228b is unlike the statute invalidated in *Stanton.* Congress did not prescribe or suggest roles for those women who felt the need to retire early from the railroad industry. The legislators relied on reported facts descriptive of the then employment pattern of women. The statute was not a statement that women as a group always need special treatment. When the employment situation changed, then Congress altered the law to equalize the treatment of males and females in the railroad industry.[27]

■ Plaintiff rightly contends that the Equal Protection Clause as interpreted in *Reed,* prohibits "dissimilar treatment" of males and females who are "similarly situated." *Reed,* as well as *Frontiero,* also invalidates gender-based classifications founded solely on administrative convenience. *Reed, supra,* 404 U.S. at 76–77, 92 S.Ct. at 254, 30 L.Ed.2d at 229, accord, *Frontiero, supra,* 411 U.S. at 690–91, 93 S.Ct. at 1772, 36 L.Ed.2d at 593. However, Chief Justice Burger also explicitly stated in *Reed* that it has been "*consistently recognized that the Fourteenth Amendment [Fifth Amendment] does not deny to States [federal government] the power to treat different classes of persons in different ways.*" *Reed, supra,* 404 U.S. at 75, 92 S.Ct. at 253, 30 L.Ed.2d at 229. (emphasis added).

■ Contrary to the situation which obtained in *Reed,* here the legislative history reveals that men and women in the railroad industry were dissimilarly situated in the following respects. Women were a strikingly small proportion of railroad employees. Significantly, in 1970, women constituted a smaller percentage of the total work force than they had in 1945. Furthermore, the data demonstrated that the railroad industry had been no oasis in that desert of higher-paying jobs for women. During the year when Chairman Latimer testified, the data indicated that women were less than two tenths of one percent of the executives, officials and staff assistants, less than three percent of the professional and sub-professional assistants, and approximately two percent of the supervisors or clerks, even though they constituted approximately eight percent of the total work force. As recently as 1970, women were less than one and one-half percent of the executives, officials and staff assistants, and less than four percent of the supervisors and professionals.[28] In addition, there was a fifteen to twenty percent wage differential between male and female employees in the railroad industry. See Plaintiff's Brief in Support of its Motion for Reconsideration, at 8.

maternity benefits to cease employment only at the end of their seventh month of pregnancy.

**27.** The Railroad Retirement Act was amended by Public Law 93–69, 87 Stat. 162, to eliminate the compensation differential between male and female annuitants whose retirement benefits accrued after July 1, 1974.

**28.** Defendants Supplemental Memorandum, at Appendix C.

Calculation of annuity payments has been based on the average monthly compensation of a railroad employee. The average monthly compensation for railroad employees who subsequently became annuitants was higher for male workers in every year for which such statistics were kept by the Railroad Retirement Board. Defendants' Supplemental Memorandum, at Appendix A.

Congress also considered statistical evidence on the status of women in the work force in the United States in making its decision to adopt the amendment to section 228b. The testimony of Chairman Latimer revealed that the proportion of women unable to continue to work at age 60 was greater than the proportion of men unable to continue to work at age 65. Strikingly, as late as 1965, the Social Security Board reported that "there were over two and one-half as many male workers age 60–64 as there were females age 60–64." [29] *Gruenwald v. Gardner*, 390 F.2d 591, 592 n.1. (2d Cir. 1968). To refute the defendant's contention that men and women were not similarly situated, either in the railroad industry or in the total work force, plaintiff relies predominantly on statistics from an era 22 years after Chairman Latimer had testified and Congress had passed the statute in issue.

■ Plaintiff's expert's testimony is no more credible than Chairman Latimer's and, in most respects, it is far less persuasive. First, the information presented by the plaintiff on the comparative life expectancies of males and females for the years 1930 through 1970 is irrelevant for two reasons: (1) it is evident from Mr. Latimer's statement that Congress felt that special treatment of female employees was warranted despite the fact that there was evidence of "greater longevity of women as compared with men"; [30] and (2) what is at issue in the instant suit is the work, rather than life, expectancy of males as compared

with females for the years 1947 through 1974. Furthermore, Dr. Miller appears to have conflicting notions of what constitutes a statistically significant difference. At one point in his deposition, Dr. Miller commented on certain percentage figures collected by the Bureau of Census on males and females reporting ill health as their reason for not seeking employment and/or working. When asked if the figures for 1964 through 1974 in that survey were comparable, Dr. Miller responded: "Yes, they are. They don't differ by more than a percentage point. You would draw exactly the same conclusion if you looked at any of the years." Deposition of Dr. Herbert P. Miller, 21. From Dr. Miller's testimony in this instance, I infer that he does not regard a one percentage point difference as statistically significant. However, in concluding that the unemployment rate for women aged sixty to sixty-four years was lower than that for men in the same age group, Dr. Miller used data from 1962 through 1974. That data revealed that in over ten of those twelve years, the male unemployment rate was greater than that of females *by no more than one-half to one percentage point.* Deposition of Dr. Herbert P. Miller, 18. I am unable to see how Dr. Miller could find that a one percent statistical difference was so significant in the unemployment study when such a difference was insignificant in the Bureau of Census health study.

Even if I were to accept Dr. Miller's evidence at face value, it fails to negate both the disparity in wages between male and female railroad employees and the underrepresentation of women in executive, official and staff positions. Perhaps Dr. Miller would not have voted for the legislation, but I cannot find that Congress committed a constitutional error when rejecting Dr. Miller's view of parity between men and women in the railroad industry. Fortunately for women today, the disparity is not as great as it was in 1945, but to assume

---

**29.** Chairman Latimer based a portion of his testimony with respect to women's inability to continue to work until age 65 on Social Security Board data.

**30.** See Text, supra, at 1051.

that the millenium has been reached requires both naivete and obliviousness to data.

Not only is the analysis in *Reed* inapplicable in this case, but also *Weinberger v. Wiesenfeld* presents a wholly—different situation from that which obtains here. The Court in *Weinberger* specifically found, upon examination of the legislative scheme and history of § 402g of the Social Security Act, that the asserted purpose *could not have been a goal* of that statute. In fact, the legislative history revealed a clearly demarcated purpose—to provide children with one parent the opportunity to have that parent's personal attention. *Weinberger, supra*, 420 U.S. at 647, 95 S.Ct. at 1233, 43 L.Ed.2d at 524. As in *Weinberger*, the defendant contends that the statute herein attempts to rectify the effects of past discrimination rather than compound discrimination based on sex. Congress is said to have intended to supplement the income of female railroad employees, all but 1% of whom were concentrated in the lower paying jobs in the railroad industry. The evidence introduced by the defendant reveals a disparity in income for male and female railroad employees. Smaller contributions were made by and on behalf of lower-salaried individuals to the retirement fund. Woman should find little solace in Dr. Miller's conclusion that the gap in income between women and males in the railroad industry was not as large as the gap in some other industries. Congress could have decided that special provision for female annuitants was necessary in order to supplement their retirement income. The legislators' adoption of the Act for this compensatory purpose is not belied by "any inquiry into the actual purposes underlying . . . [the] statutory scheme." *Weinberger, supra*, 420 U.S. at 648, 95 S.Ct. at 1233, 43 L.Ed.2d at 525.

Congress' purpose in enacting § 228b was to decrease "the disparity between the economic capabilities of a man and a woman" employed in the railroad industry. See *Kahn v. Shevin, supra.* Here, just as in *Schlesinger v. Ballard*, the differential treatment of male and female annuitants was based on the demonstrable fact that men and women were not similarly situated with respect to opportunities in the railroad industry.

Congress recognized the impact of the recent improvements and thus in 1973 it eliminated the annuity difference between men and women. This recent legislative change is similar to that which the Navy had proposed to Congress in *Schlesinger v. Ballard*, that female Naval lieutenants should in the future be governed by the same standards as male lieutenants. And the Supreme Court's response to the Navy's proposals in *Schlesinger* is similarly applicable to the instant case:

> These developments no more than reinforce the view that it is for Congress, and not for the courts, to decide when the policy goals sought to be served by § 6401 are no longer necessary to the Navy's officer promotion and attrition programs.

*Schlesinger, supra*, 419 U.S. at 510, 95 S.Ct. at 579 n.13, 42 L.Ed.2d at 619.

Plaintiff contends that the special annuity provision could not have been drafted with the compensatory purpose suggested by the defendant in mind, for the statute bestows special benefit "only to that small number of women (6,300 in 1972), who retired between the ages of 60 and 64 after working 30 years in the railroad industry." Plaintiff's Brief in Support of Motion for Reconsideration, at 12.

The contention here is the exact opposite of the argument made by some dissenting Justices in *Kahn v. Shevin.* In *Kahn,* Justices Brennan and Marshall complained that the property tax statute could have been drafted differently so that "its purpose would have been accomplished more precisely." Justice Douglas' answer to Justices Brennan and Marshall is equally instructive in this case: "But the issue of course, is not whether the statute could have been drafted more wisely, but whether the lines chosen by the . . . Legislature are within constitutional limitations." *Kahn v. Shevin, supra,* 416 U.S. at 356 n.10, 94 S.Ct. at 1737, 40 L.Ed.2d at 194.

The "newer" equal protection standard does not require the choice of any one method of advancing a compensatory purpose.[31] A recent case, *Jefferson v. Hackney, supra,* outlines the breadth of legislative choices, once the classification has been shown to be "rational and not invidious":

> This court emphasized only recently, in *Dandridge v. Williams* [citation omitted] that in 'the area of economics and social welfare, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect.' A legislature may address a problem 'one step at a time,' or even 'select one phase of one field and apply a remedy there, neglecting the others.' *Williamson v. Lee Optical Co.* [citation omitted]. So long as its judgments are *rational, and not invidious,* the legislature's efforts to tackle the problems of the poor and the needy are not subject to a constitutional straightjacket. The very complexity of the problems suggests that *there will be more than one constitutionally permissible method of solving them* (emphasis added).

*Jefferson v. Hackney, supra,* 92 S.Ct. at 1731.[32]

Often when an objection is raised about the precision with which ameliorative legislation is drafted, the protesting party is hiding the real basis for the objection, namely, the desire that no legislation should be approved which affirmatively compensates for past inequalities. While I am cognizant of developing trends in constitutional theory, I cannot find this statute invalid for Congress' failure to take more than "one step at a time."

Contrary to the position advanced by the government in *Frontiero,* in this case there is more than the mere allegation of administrative convenience as the justification for the statute in question. Four of the Justices in *Frontiero* also recognized the distinction between legislation which "heaped additional disadvantages" upon persons burdened with disabilities previously imposed by society, and acts of Congress which were efforts at eradicating society's past errors. Justices Brennan, Marshall, White, and Douglas could rationally draw such a distinction because a benign,[33] albeit sex-based, classification is not prone to the dangers created by those distinctions which have historically resulted in the deprivation of opportunities for women. Section 228b did not impose any "status of inferiority";[34]

31. Professor Gunther counsels that:
"the strengthened 'rationality' scrutiny [of the newer equal protection test] would curtail the state's choice of means far less severely than the new equal protection approach. The Warren Court's strict scrutiny repeatedly asked whether the means were 'necessary' and whether 'less drastic means' were available to achieve the statutory purpose. . . . The more modest interventionism, by contrast, would permit the state to select any means that substantially furthered the legislative purpose." Gunther, supra note 9, at 20.

32. Although the standard of rationality used in *Jefferson* was more akin to the "traditional" equal protection test than the "newer" test, the range of legislative options, once the classification has been proved valid under more rigorous standards, remains the same.

33. A benign classification has been defined in the racial context as "programs which attempt to redress the effects of past racial discrimination." Developments, supra note 9, at 1104.
In their comprehensive article on the impact of the ratification of the Equal Rights Amend-

ment, Brown, Emerson, Falk, and Freedman define compensatory aid as:
special assistance to members of one race in order to give them the education, training or *other help* that will put them more quickly on a level of equality with the other race. (emphasis added)
Brown, supra note 1, at 903. § 228b would be classified as compensatory aid. While we are not applying the standards of strict judicial scrutiny, we note that the authors of the above article conclude that a court, in applying strict judicial scrutiny, would find compensatory aid constitutional at least in the area of race relations:
"where the courts determine that the purpose of the differentiation is *to benefit* members of the minority race, rather than to impose a *status of inferiority,* they are likely to find 'compelling reasons' for the special treatment. *Id.* at 904 (emphasis added).

34. Professor John Ely suggests that special scrutiny is not appropriate when benign classifications are involved. He also proposes that "it is not 'suspect' in a constitutional sense for a majority, any majority, to discriminate against itself." In the racial context, Professor

it was not premised on any presumption about the role of women. No assumption was made that women were permanently inferior to males and thus would always require special treatment. See Text, *supra,* at 1057.

There are a series of cases pertaining to portions of the Social Security Act which, if not perceptively understood, would seem repugnant to the holding in this case. The leading case in this area is *Jablon v. Secretary of Health, Education and Welfare,* 399 F.Supp. 118 (D.Md.) *appeal docketed sub nom. Matthews v. Jablon,* 44 U.S.L.W. 3364 (U.S. Nov. 19, 1975). In *Jablon* a three-judge court found that § 402(c)(1)(c) of the Social Security Act violated the Due Process Clause of the Fifth Amendment. That section of the Social Security Act provided derivative "husband's benefits" for males who proved that they received more than one-half of their support from their wives during certain periods. Women did not have to prove dependency in order to receive these derivative benefits. The court in *Jablon* rejected the government's claim that § 402(c) was remedial legislation designed to provide economic compensation for women for past discrimination. 399 F.Supp. at 129–30. It is important to note that in the paragraph subsequent to the

Ely maintains that: " 'special scrutiny' is not appropriate when White people have decided to favor Black people at the expense of White people." Ely, "The Constitutionality of Reverse Racial Discrimination," 41 U.Chi.L.Rev. 723, 727 (1974).

Using Ely's schema, women have certainly not been the legislatively dominant group. The Supreme Court stated in *Frontiero*: "It is true, of course, that when viewed in abstract, women do not constitute a small and powerless minority. Nevertheless, in part because of past discrimination, women are vastly underrepresented in this Nation's decision-making councils. . . . Not a single woman presently sits in the United States Senate, and only 14 women hold seats in the House of Representatives. And . . . this underrepresentation is present throughout all levels of our State and Federal Government." *Frontiero,* supra, 411 U.S. at 686, 93 S.Ct. at 1770 n.17, 36 L.Ed.2d at 591.

**35.** Title VII of the Civil Rights Act of 1964 provides, in pertinent part:

rejection of the government's remedial claim, the court found that the statute had an "indirect" "adverse impact" on women. The supposedly prophylactic statute operated to the disadvantage of the working wife by diminishing the family protection generated by her earnings, when compared with the family protection created by the working husband's earnings. The statute actually perpetuated the same vice it was designed to rectify—past economic discrimination against female wage earners. See *Moss v. Secretary of Health, Education and Welfare,* 408 F.Supp. 403 (M.D.Fla. 1976). Such an "indirect adverse impact" on women is not created by § 228b of the Railroad Retirement Act.

I regard the court's finding that § 402(c) of the Social Security Act had an "indirect" "adverse impact" on women as a crucial factor in its rejection of a remedial purpose for that statute. Given that § 228b does not have such an "adverse impact" on women, the court's decision in *Jablon* does not mandate a rejection of the remedial purpose served by § 228b in this case.

## VII. APPLICATION OF TITLE VII TO SECTION 228b

The plaintiff contends that § 228b was "impliedly repealed" by the Civil Rights Act of 1964 [35] and relies on *Rosen v. Public*

"(a) It shall be an unlawful employment practice for an employer—

. . . .

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin."
42 U.S.C. § 2000e–2(a).
The Equal Employment Opportunity Commission in April 5, 1972 issued its revised "Guidelines on Discrimination Because of Sex", which provide in relevant part:
"Fringe Benefits:
(a) 'Fringe benefits,' as used herein, includes medical, hospital, accident, life insurance and retirement benefits; profit-sharing and bonus plans; leave; and other terms, conditions, and privileges of employment.
(b) It shall be an unlawful employment practice for an employer to discriminate between men and women with regard to fringe benefits.

*Service & Gas Co.,* 477 F.2d 90 (3d Cir. 1973), and *Bartmess v. Drewrys U.S.A., Inc.,* 444 F.2d 1186 (7th Cir. 1971) in support of this proposition.

Plaintiff's contention is without merit for the following reasons. First, the subject matter in both *Rosen* and *Bartmess* was the validity of private retirement and/or pension plans under Title VII. However, the Railroad Retirement benefit system is not the equivalent of a private pension plan. See Text, *supra,* at 1049–1050. Furthermore, in neither case was there any allegation that a primary purpose of the pension plan was to compensate for previous wage discrimination.

■ Moreover, plaintiff's contention is premised on an alleged inherent conflict between Title VII and § 228b of the Act. After careful consideration of this claim, I fail to find any such inconsistency between these two legislative provisions. Under Title VII, Congress explicitly empowered the courts, upon a finding of unlawful employment practices, to "enjoin . . . and order such affirmative action as may be appropriate." 42 U.S.C. § 2000e–5(g). The purpose of the quoted portion of Title VII is to allow the court to make the victims of past discrimination whole by restoring them "to their rightful economic status absent the effects of the unlawful discrimination." See *Robinson v. Lorillard Corp.,* 444 F.2d 791, 802 (4th Cir.), *cert. dismissed,* 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655 (1971).[36]

The statute in this case has exactly the same thrust as the quoted portion of Title VII—to place women in their rightful economic place through affirmative action.

The passage of Title VII did not preclude Congress from enacting other affirmative measures in order to overcome the effects of discrimination. The Third Circuit recognized that Title VII did not forbid the imposition of affirmative action plans under presidential authority through executive orders in *Contractors Ass'n of Eastern Pa. v. Sect. of Labor,* 442 F.2d 159 (3d Cir. 1971):

> To read § 703(a) in the manner suggested by the plaintiffs we would have to attribute to Congress the intention to freeze the status quo and to foreclose remedial action under other authority designed to overcome existing evils. We discern no such intention either from the language of the statute or from its legislative history.[37]

442 F.2d at 173. The Court also found that § 703(j) was "a limitation only upon Title VII not upon any other remedies, state or federal." 442 F.2d at 172. Furthermore, the Supreme Court has explicitly recognized the power of Congress to enact legislation to implement the Equal Protection Clause. See *Katzenbach v. Morgan,* 384 U.S. 641, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966).[38]

■ I find that, because of the lack of any inconsistency between Title VII and § 228b, the latter was not repealed by implication.

---

(f) It shall be an unlawful employment practice for an employer to have a pension or retirement plan which establishes different optional or compulsory retirement ages based on sex, or which differentiates in benefits on the basis of sex. . . . "
29 C.F.R. § 1604.9 (1972).

**36.** Although *Robinson v. Lorillard* specifically concerned the court's power to award back pay, a court is not limited to that form of relief. The statute provides for such "affirmative action as may be appropriate." 42 U.S.C. § 2000e–5(g).

**37.** § 703(a) is found in 42 U.S.C. § 2000e–2(a).

**38.** Even if the Equal Rights Amendment is ratified, in which case the authors of the Brown article conclude that compensatory aid would not be permissible, those same authors nonetheless find that:

> "This does not mean, however, that the government would be powerless to take measures designed to assure women *actual* as well as *theoretical* equality of rights. Authority *to remedy the effects of past discriminations* as well as to implement the provisions of the Equal Rights Amendment is available and unquestioned. Brown, *supra* note 1, at 904. (emphasis added)

## VIII. CONVENING A THREE–JUDGE COURT

 Where a claimant seeks to enjoin the operation of a federal statute because of an alleged violation of some provision of the Constitution, a district court must first decide whether the challenge, in this case to Section 228(a)(3) of the Railroad Retirement Act of 1937 as amended, is so substantial as to warrant the convening of a three-judge court pursuant to 28 U.S.C. §§ 2282, 2284. The substantiality test here required an analysis of the Supreme Court's recent decisions in cases involving gender-based classifications in statutes, in order to ascertain whether claimant had "a reasonable chance of surviving the tide of *stare decisis*." [39] In light of the foregoing analysis of Supreme Court decisions, it is evident that there is no need to convene a three-judge court to consider plaintiff's claim.

## IX. CONCLUSION

We are not evaluating section 228b as if Congress were passing an act today to provide pensions for persons whose rights would accrue in the year 2000. Rather, we are analyzing a statute, passed in 1945, which offered some advantage to women who had limited options at that point in this country's history.

To read plaintiff's briefs and Dr. Miller's testimony, one would infer that the history of women in America, or at least in the railroad industry, has been one of total parity and equal opportunity and that the conclusion of Chairman Latimer in 1945 was a figment of wild imagination. But plaintiff's position is contrary to the pages of history of which the Supreme Court has so repeatedly spoken. We must recognize that the Supreme Court moved from in 1872 considering women as "naturally timid," "delicate," and "evidently unfit" for many of the occupations of civil life [40] to, in 1974, the Court categorizing past deprivations as either "overt discrimination" or "the socialization process of a male dominated culture." [41] If the Supreme Court's consciousness could be heightened and changed in a century, what made it impermissible for the Congress in 1945 to grasp the impact of those disparities which the Supreme Court has found and so eloquently described. Section 228b has since been amended to take account of what Congress considers to be a different era with heightened options for women.

Just twelve months ago, the United States Supreme Court held in *Weinberger v. Wiesenfeld, supra,* 420 U.S. at 653, 95 S.Ct. at 1236, 43 L.Ed.2d at 528 (emphasis added), that a gender-based classification violates the Due Process Clause *unless* it can "be explained as *an attempt* [by Congress] *to provide for the special problems of women.*" § 228b of the Railroad Retirement Act is a demonstration that Congress took such "special problems" into consideration.

Plaintiff's Motion for Reconsideration is DENIED.

---

**39.** See Memorandum Opinion, *Lewis v. Cowen,* Civil Action No. 73–2876 (E.D.Pa., filed April 21, 1975) for the applicable standards to be applied in determining whether to convene a three-judge court.

**40.** *Bradwell v. Illinois, supra,* 83 U.S. at 139, 21 L.Ed. at 446.

**41.** *Kahn v. Shevin, supra,* 416 U.S. at 353, 94 S.Ct. at 1736, 40 L.Ed.2d at 192.